28 C.C.P.A. (Patents)

In re SMITH.

Patent Appeal No. 4446.

Court of Customs and Patent Appeals.

March 31, 1941.

Cushman, Darby & Cushman, of Washington, D. C. (William M. Cushman and John W. Malley, both of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, affirming a decision of the examiner rejecting claims 36 to 43, inclusive, of appellant's application for a patent for lack of patentability over the cited prior art. Claim 1 was allowed. All of the rejected claims are apparatus claims, with the exception of claim 43 which is a method claim.

Claims 36 and 43 are illustrative of the claims in issue, and read as follows:

"36. In apparatus for completing a well having casing and a flow tubing therein, in formation having high pressure, a casing head, a hanger seat in said head, a drilling master valve mounted on said head above said seat, means on said head with which said valve is removably secured, said means being also adapted to connect with a christmas tree including a smaller flow control valve supported on said head, said head and seat and drilling master valve having bores at least as large as that of the casing to permit operations prior to completion such as passing a drill substantially as large as the casing bore therethrough, a hanger adapted to be secured to the flow tubing and of diameter adapting it for lowering through said drilling master valve for disposition in said seat to seal the well against flow of fluid from the casing, and means operable while said drilling master valve is mounted on said head 'for locking said hanger in said seat against upward movement under well pressure, whereby said securing means on said casing head may be disengaged for removal of said drilling master valve, and engaged with the christmas tree supported on said head including a smaller flow control valve having a smaller pressure subject area for use when the well is flowed through the tubing."

"43. The method of bringing in a well in formation having high pressure, provided with a casing, casing head and drilling master valve positioned on and above the same having bores to permit of drilling therethrough, comprising drilling through the casing head and valve, removing the drill and leaving the valve in place on the casing head, lowering flow tubing equipped with a hanger into the well through said valve, hanging said tubing in the casing head below said valve, simultaneously forming a seal with said hanger between the same and the casing head below said valve by the weight of the flow tubing, making permanent said last named seal against upward movement of the hanger under well pressure which could be great enough to overcome the weight of the tubing by locking said hanger in the casing head while the drilling master valve is still mounted on the casing head, thereafter removing the drilling master valve while the well is still under high formation pressure, and replacing said valve with a smaller flow control valve having a smaller pressure subject area for use when the well is flowed under natural formation pressure through the tubing."

The references cited by the examiner are:

Minor, 1,812,358, June 30, 1931.

Rasmussen, 1,859,793, May 24, 1932.

Conroy, 1,886,167, November 1, 1932.

Grinnell, 1,852,716, April 5, 1932.

Grinnell [et al.], 1,910,762, May 23, 1933.

Penick [et al.], 1,969,234, August 7, 1934.

Penick et al., 2,015,454, October 8, 1935.

"Petroleum Engineering Hand Book, second edition."

Palmer Publications, Inc., Los Angeles, Cal., March 17, 1932.

Pearce [et al.], 1,642,745, September 20, 1927.

Crowell, 1,646,639, October 25, 1927.

Howard, 2,082,107, June 1, 1937 (filed December 16, 1931).

The Oil Weekly, January 23, 1931, page 93.

Howard, 1,929,781, October 10, 1933.

The last four references are not cited or referred to by the Board of Appeals.

The subject matter of the claimed invention relates to the completion of an oil well, beginning with the positioning of equipment for "drilling in" to the high pressure sands and ending with the flow tubing inserted and the well sealed and equipped to flow.

The application herein has been twice before the tribunals of the Patent Office. The statement of the examiner, dated November 19, 1936, discloses the final rejection by him of claims 21 and 23 to 30 inclusive for lack of patentability over substantially the same prior art as that cited above. Claim 22, which relates to the tapered tubing hanger (renumbered as claim 1 in this appeal), was allowed. Upon appeal the Board of Appeals, in its decision of March 18, 1937, affirmed the decision of the examiner as to claims 21, 28, 29 and 30. The appeal as to claims 23 to 27 was dismissed. Appellant then filed suit against the Commissioner of Patents under R.S. § 4915, 35 U.S.C.A. § 63, in the United States District Court for the District of Columbia. Prior to the hearing of that suit, the Board of Appeals, on February 8, 1939, reversed, as to certain claims, the decision of the examiner rejecting all of the claims of a later filed companion application of appellant's assignee upon which patent No. 2,150,887 issued. Appellant states in his brief here:

"The latter decision held similar but more limited claims to basically the same subject matter now before this Court, but with certain improvements, to be patentable in the companion application over substantially the same art which the Board had used in rejecting the present application in their earlier decision of March 18, 1937."

Appellant, regarding the decision of February 8, 1939 as a reversal of the decision of March 18, 1937, dismissed the aforementioned suit, brought the present application back to the Patent Office under the said allowance of one claim and thereafter forfeited and renewed the application, presenting, for the first time in said application, the claims here involved. All these claims were rejected, as afore-

said, and the board was requested to reconsider its decision, said request being particularly directed to a reconsideration thereof with respect to the method claim, 43. The board thereafter held that its prior decision was not in error and again affirmed the decision of the examiner.

While the notice of appeal contains many reasons of appeal, appellant, in his brief, states he believes, and the Solicitor for the Patent Office in his brief concurs, that the appeal can be decided on the basis of the following questions:

1. Was it proper, in the decision appealed from, to depart from the carefully considered opinion of the Board of Appeals which granted the companion patent 2,150,-887, which opinion declared appellant's teaching of the solution of the whole problem to be invention, and declared that the references now relied on in the present appeal are not sufficiently pertinent to need discussion, in that they relate only to "details" which admittedly are old?

2. Was it proper, in the decision appealed from, to refuse the claims while admitting that the subject matter thereof is both novel and highly useful?

3. Was it proper, in the decision appealed from, to declare that several references which admittedly do not teach the solution of the whole problem of well completion, may be modified and brought together to form the whole taught by appellant in the face of respectable evidence in the record that such modification of prior teachings was not obvious to those skilled and actually working in the art?

We think that the three questions presented by appellant embrace everything that is material to his contentions and, therefore, will confine our discussion to their consideration.

■ We are not impressed with appellant's contentions growing out of the first question presented. Each of the apparatus claims allowed in the application (now patent 2,150,887) in effect calls for "a tubing engaging blow-out preventer mounted above said drilling master valve," and the single allowed method claim requires a "blow-out preventer." These limitations are not shown in the present claims. While, aside from the stated limitations, the claims herein are quite similar to those allowed in patent 2,150,887, we think that the rule set out in the case of In re Fischer, 91 F.2d 219, 221, 24 C.C.P.A., Patents, 1344, is applicable here. The

court in that case stated: "The general rule is that patentability of a claim may not be based upon the allowance of other claims in another application."

With respect to question 2, even though it be conceded that the subject matter thereof be novel and useful, we must go further to determine whether the exercise of the inventive faculty was required to construct the involved apparatus and devise the method defined in the rejected claims.

Question 3 involves details to be dealt with in deciding question 2.

It appears that in the drilling of oil wells, after a hole has been bored from the surface for a certain distance a string of pipe called casing, supporting the hole, is inserted, reaching from the top of the well to the bottom of the hole. Then the hole is bored more deeply and a smaller casing, extending from the top of the well to the new bottom, is installed within the first casing. In reaching the proper depth for the well, several strings of casing may be used in the same manner. As each casing is inserted cement is pumped down through the casing and up around the outside thereof and permitted to harden. Then the plug of cement in the bottom of the particular string of casing is drilled out and the drilling continues, to make a hole for the succeeding string. Necessarily, the diameter of the casing becomes smaller as the well becomes deeper. After all of the casing has been cemented, steps are taken to complete the well, namely, the "drilling in" to the stratum where the pressure of oil and gas may be tremendous, at times being over 4,000 pounds to the square inch, the placing of flow tubing, the sealing of the well and equipping it for flow.

In order to combat the high pressure, the casing is kept filled with mud weighted with barytes until the mud is four times as heavy as water. Fresh drilling mud is pumped down through the drill pipe and circulated out at a surface valve all the time the drill is in the hole. While the weight of the drilling mud by itself is considered sufficient to control the pressure, it is the usual practice to use a drilling master valve while drilling in order that the well may be closed when the drill is removed and the circulation of the mud ceases. When the circulation ceases the mud may separate and gas may cut the mud, resulting in a blow-out if the well is not kept closed.

Because the gas and oil will separate if permitted to flow through the casing, a smaller flow tubing is provided so that the gas, instead of rushing out and leaving the oil behind, will be maintained in proper ratio to the oil as both oil and gas flow through the flow tubing. Means are provided for sealing the space between the tubing and the inner wall of the casing.

Appellant's apparatus and method are directed toward the carrying out of the operations following the installation of the last string of casing, namely, the "drilling in" to the pressure sands, the installation of flow tubing, the sealing of the well, the removal of the drilling master valve and the installation of the Christmas tree valve on the flow tubing. All of these steps are performed while the well is still under high pressure. As an aid to clearer understanding of the said apparatus and method, Fig. 5 of appellant's drawing is herein reproduced:

Fig. 5.

Referring to the drawing, 2 is the tubing head secured to the upper end of the casing. Integral with the tubing head is an inside supporting seat 12 which is upwardly tapered to a diameter wider than the interior diameter of the casing 40. Secured to and above the tubing head 2 is a drilling master valve 10 actuated by the wheel 11, the bore of the valve being wider than the bore of the casing. At 5 and 4 are openings for the flow lines through which the drilling mud emerges. The seat 12 receives the tubing hanger 13 which supports the flow tubing 14. The specification discloses a plugging tool to plug the tube, but the tool is not claimed in claims herein. A collar 15 is shown on the tubing and it engages hanger 13 to form a rigid support for the tubing 14 which, when placed, may extend to the bottom of the well. The hanger fits tightly around the tubing and into the seat and is locked in place by the screws 42, thus preventing a blow-out by sealing off the space between the casing wall and the flow tubing. When the said sealing has been made the expensive drilling master valve is removed and replaced by a much smaller and much less expensive valve known in the art as a "Christmas tree." The well is then in the flowing stage and the drilling master valve may be used on other wells.

It is to be observed in the structure of appellant that owing to the placing of the drilling master valve above the casing head any equipment necessary for use on the well may be mounted at any time above the drilling master valve when it is closed. Then the equipment may be passed to the full width of the casing downwardly through the valve and casing and when in desired position the valve may be again closed. If a blow-out threatens while the well is being tubed the tubing hanger surrounding the tube may be immediately dropped into place and tightened on the seat, thus preventing blowing out of the material in the casing.

It is not contended by appellant that any part of his apparatus is new. He does contend, however, that he has solved a recognized problem by his equipment and procedure. In his brief he states as follows: "Appellant contends that the only question involved is whether there is invention in the foundation equipment disclosed which, without modification after 'drilling in' to the high pressure sands, is capable of performance through the 'unitary operations' of drilling and the allied steps, insertion and sealing of the tubing, and then removing the control equipment in the form of the master drilling valve, after its full protective use has been enjoyed, and replacing the same with the christmas tree including a more efficient flow control valve of reduced pressure subject area to correspond with the size of the tubing, while the well is still under high formation pressure."

We do not consider the issue here as involving anything of a highly technical character.

There is no single reference which meets appellant's disclosure, but it may be possible that if various different parts of apparatus disclosed in the prior art were modified and assembled the result might be a device substantially similar to the structure of appellant. The question is whether or not such an assembly would be obvious to one skilled in the art.

The patent to Penick et al., No. 1,969,234, relied upon by the examiner as the basic reference, provides for a well head assembly wherein the flow tubing is supported by a hanger below a large valve called by the patentee a "gate valve." On the top of the gate valve is mounted a "Christmas tree." These valves appear to be permanent fixtures on the well throughout the entire flowing stage. Appellant's disclosure teaches removal of the costly drilling master valve and mounting of the "Christmas tree" for the flowing stage. The casing head where the tubing hanger fits is restricted to a diameter less than that of the casing, in the aforesaid Penick et al. reference. The casing head and hanger seat as defined by the apparatus claims on appeal have a bore therethrough at least as large as the casing. Therefore, it is clear from these differences that in Penick et al. patent No. 1,969,234 the patentee did not disclose, teach or suggest the invention here claimed in the apparatus claims.

Penick et al. patent No. 2,016,454 discloses a well head, the inside diameter of which is substantially equal to the inside diameter of the casing. In the head there is an inside annular channel or groove in which, after "drilling in" and before "tubing", there is mounted, by means of a special tool, a removable, expansible ring which fills the groove and projects into the bore of the well head, there forming the seat upon which the tubing hanger is supported and locked. It is evident that after "drilling in" and before "tubing" it is neces-

sary that the control gate or valve be kept open in order that the expansible ring may be mounted as aforesaid. The pressure in the casing would be released to blow out during said mounting, and without a closing means below the head neither the seat nor the hanger could be placed. In our opinion the Penick et al. patent No. 2,016,454 has taught the art nothing, either alone or in combination with the former Penick et al. patent, that would make obvious to one skilled in the art appellant's structure or method.

While patent No. 1,929,781 to Howard shows a tapered tubing hanger seat which is larger in diameter than the diameter of the casing, the hanger seat is integral with the valve. The drill pipe or tubing in this arrangement is hung in the valve body and not below the same. This reference was used by the tribunals below only for the purpose of showing a tubing seat which is larger than the diameter of the well casing.

Howard patent No. 2,082,107 was not relied upon by the board, and it is not clear from the examiner's statement whether or not reliance was placed upon this patent as a reference. In any event, the examiner did not refer to it by number nor did he distinguish it from the former Howard patent. We have examined this later patent and find in the drawing of one form of the apparatus a seat which is intended to do away with the use of retractable hanger seats projecting into the bore below the master valve. The seat is intended to form a seal between the casing and the tubing to close off the well, and, as shown in this form, is a restriction in the bore similar in effect to that pointed out in the Penick et al. patent No. 1,969,234.

The Minor patent No. 1,812,358 was cited merely because it discloses a tubing seat which is larger than the diameter of the well casing. It also shows locking screws for its packing device, operable from without the head to which a "Christmas tree" is intended to be connected. No drilling master valve is disclosed.

We do not deem it necessary to lengthen this opinion unduly by a further discussion of the cited references, because it is admitted that claims 36 to 42, inclusive, define apparatus structurally different from any apparatus shown in the cited prior art.

We have discussed some of the references merely to illustrate the theory upon which the decisions below were made, namely, taking from various structures of the references small details and applying them to the general Penick et al. reference.

It was held below that the combination effected by appellant required nothing more than mechanical skill, in view of the disclosure in the references. It was not held, however, that appellant's apparatus is not new and useful.

It seems to us, as was contended by appellant, that his conception embraced the completing of a well as a whole and that he built an equipment which—taught the art the use of foundation equipment to be positioned on the well before "drilling in" to the high pressure sands, of such special arrangement and size of parts that, without modification the drilling and allied operations requiring the full width of the well casing might be rapidly continuously and progressively performed, immediately followed by the insertion, hanging and sealing of the tubing, in such way that the expensive master drilling valve, while the protection of its use was enjoyed during the performance of the above mentioned operations, can be removed for use on other wells and replaced by the smaller, more efficient, and less costly Christmas tree flow control valve, at the time of completion of the well, and while it is still under high formation pressure.

We do not think the references teach or suggest appellant's claimed combination and method. We are fortified in this respect by the contents of affidavits contained in the record. It appears from them that a serious problem existed in the art of completion of oil wells in high pressure formations. The problem was to devise a structure and method whereby the drilling master valve, after it had accomplished its purpose in well completion, could be removed for use on other wells and without change in the said structure. It may be pointed out here that there is no reference of record showing the replacement of a big valve with a little valve. The affidavits show that the necessary use of the drilling master valve was well known in the art and it was extensively used in the control of wells in high pressure formations. When the well reached the flowing stage it was customary in the prior art to pass the flow of gas and oil through a structure comprising the drilling master valve and the "Christmas tree" mounted above it. This is illustrated particularly in the Penick et

al. patents. The drilling master valve remained in the structure throughout the flowing stage and by the time the pumping stage was reached it would probably be useless by reason of corrosion. In any event, there was no necessity for its presence in the structure during the flowing stage, as it had then no function.

A drilling master valve of average size is apparently many times as costly as a "Christmas tree." If the drilling master valve could have been safely removed from the well for use on other wells after it had performed its function in completing the well, and the "Christmas tree" substituted therefor without further change in the well structure, a great saving would have been made on the cost of each well. In the large number of wells drilled in high pressure formations by single operators or large companies the savings by reason of the change would have amounted to a large sum of money.

Men of long experience, skilled in the art of oil well drilling, state in their affidavits of record that in the condition of the art prior to the use of appellant's device and method, operators were in many instances compelled to leave the drilling master valve on the well until the pumping stage was reached, or the well had to be "killed" when it was desired to remove the valve. No other method appears to have been known to remove the valve.

It further appears from the affidavits that the claimed invention was unknown in the oil fields, and when it was first explained to workers skilled in the art they doubted that it could solve the problem of how to remove and replace with the "Christmas tree" the drilling master valve. When, however, the appellant's apparatus and method were tried, the doubt disappeared. Since then the structure and method of appellant have been widely used and they now enjoy great commercial success.

It seems to us that it is reasonable to assume that the prior art must have been well known to the experienced large scale oil well operators, the gist of whose affidavits we have hereinbefore set out. With this knowledge which they must have had it certainly appears to have been quite beyond the realm of the obvious for them to design a structure and method such as appellant here claims.

With respect to the method claim 43, we are not in agreement with the holding below that the step of removing the drilling master valve while the well is still under high formation pressure and replacing said valve with a smaller control valve having a smaller pressure subject area for use when the well is flowed under natural formation pressure through the tubing is so obvious that no invention would be involved in doing so. Our reason for not agreeing with this holding has been hereinbefore fully explained, we think, and does not require further discussion.

It seems to us that if obviousness can be said to be derived from the references, on the record here it must necessarily spring from knowledge derived from appellant's structure, and we think the following statement made by the court in the case of In re Deakins, 96 F.2d 845, 849, 25 C.C.P.A., Patents, 1153, is applicable: "We have carefully examined the references for a suggestion of appellant's combination and the new and useful results obtained thereby, but have found none. Of course, if the references are examined in the light of appellant's disclosure, the solution of the problem confronting appellant seems simple. A problem solved is no longer a problem, and one is prone to overlook the fact that it ever existed."

Because of our opinion that without a knowledge derived from appellant's disclosure, and having only the teachings of the cited references, it would not be obvious to one skilled in the art to construct the apparatus or pursue the method of the appellant, we must hold that the decision of the Board of Appeals with respect to all of the claims herein should be, and the same is hereby reversed.

Reversed.